UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IMPAX LABORATORIES, INC.,

               Plaintiff,

-against-

TURING PHARMACEUTICALS AG,

               Defendant.

**OPINION AND ORDER**

16 Civ. 3241 (ER)

---

Ramos, D.J.

       Impax Laboratories, Inc. ("Impax") brought this action for declaratory judgment, breach of contract, and unjust enrichment against Turing Pharmaceuticals AG ("Turing") on May 2, 2016, seeking to recover millions of dollars of rebate liability related to sales of the drug Daraprim. Turing counterclaimed, asserting breach of the same contract and breach of the duty of good faith and fair dealing. Pending before the Court are (1) Impax's motion for summary judgment on one of its breach of contract claims against Turing (Count 3) and Turing's counterclaims, Doc. 78, and (2) Turing's cross-motion for summary judgment on Impax's claim for declaratory judgment, Impax's breach of contract claims, and Turing's breach of contract counterclaim against Impax, Doc. 92. For the reasons discussed below, Impax's motion is GRANTED in part and DENIED in part, and Turing's motion is GRANTED in part and DENIED in part.

# I.     Factual Background[1]

## A.     The Medicaid Drug Rebate Program

Impax and Turing are both drug manufacturers.  *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of Cross-Motion for Summary Judgment ("Def.'s Mem.") at 5.  A drug manufacturer typically does not sell a drug directly to patients.  Def.'s 56.1 ¶ 26.  Instead, a drug manufacturer primarily sells a drug through wholesalers and distributers, who then sell the drug to providers such as retail pharmacies or hospitals.  *Id.*  Subsequently, a pharmacy or hospital provides the patient with the drug, and the patient's insurer (such as Medicaid) reimburses the pharmacy or hospital for that drug.  *Id.*  The process of distribution of the drug to a patient and payment by the insurer is known as "utilization."  *Id.* ¶ 27.

In order for a prescription drug to be eligible for Medicaid coverage, the manufacturer of the drug must participate in the Medicaid Drug Rebate Program—a program designed to help lower Medicaid spending on outpatient prescription drugs—and enter into a Medicaid Rebate Agreement with the U.S. Department of Health and Human Services ("HHS").  Pl.'s 56.1 ¶ 4; Def.'s 56.1 ¶ 30; Amended Complaint ("Am. Compl.") ¶¶ 16–17.  Under the program, state Medicaid agencies cover the cost of the drug dispensed to eligible patients, and then collect a rebate from the manufacturer for each unit of drug utilized during a calendar quarter.  Pl.'s 56.1 ¶ 7; Def.'s 56.1 ¶ 30.  Each drug is linked to its manufacturer through its unique National Drug

---

[1] The following facts are drawn from the Amended Complaint, Doc. 34, Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ("Pl.'s 56.1"), Doc. 83, Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1"), Doc. 94, and the parties' supporting submissions.

Code ("NDC"), part of which represents the manufacturer's unique labeler code.  Pl.'s 56.1 ¶ 7; Defs.' 56.1 ¶ 32; Am. Compl. ¶ 1.

A manufacturer's rebate liability for a covered drug ("Medicaid Rebate Liability") is calculated by the Centers for Medicare and Medicaid Services ("CMS") using a statutory formula and certain pricing information ("Pricing Data") submitted by the manufacturer on a monthly and quarterly basis.  *See* Pl.'s 56.1 ¶ 4, 8–9; Def.'s 56.1 ¶ 31; Am. Compl. ¶¶ 16–17.  A manufacturer submits the Pricing Data through the online Drug Data Reporting for Medicaid ("DDR") system maintained by CMS.  Pl.'s 56.1 ¶ 8.  One of the components of the Pricing Data that a manufacturer must submit to CMS is the average manufacturer price ("AMP") for each calendar quarter.  Pl.'s 56.1 ¶ 10; Def.'s 56.1 ¶ 35.  A drug's AMP represents the average price paid to the manufacturer by (1) wholesalers that distributed the drug to retail community pharmacies, and (2) retail community pharmacies that purchased the drug directly from the manufacturer.[2]  Def.'s 56.1 ¶ 35.  Manufacturers are not required to use a particular methodology for calculating AMP.  Def.'s 56.1 ¶ 36.

One methodology available to manufacturers to calculate AMP is the presumed inclusion methodology, which presumes that all sales of a drug to wholesalers are includable in AMP, except for those sales for which there is "adequate documentation" to the contrary.[3]  Pl.'s 56.1 ¶ 67.  Another methodology is the buildup methodology, pursuant to which a manufacturer only

---

[2] A retail community pharmacy is defined as "an independent pharmacy, a chain pharmacy, a supermarket pharmacy, or a mass merchandiser pharmacy that is licensed as a pharmacy by the State and that dispenses medications to the general public at retail prices.  **Such term does not include a pharmacy that dispenses prescription medications to patients primarily through the mail**, nursing home pharmacies, long term care facility pharmacies, hospital pharmacies, clinics, charitable or not for profit pharmacies, government pharmacies, or pharmacy benefit managers."  Social Security Act § 1927(k)(10) (emphasis added); Bates Report, n. 50.

[3] An example of a sale that would be ineligible for inclusion in the AMP is a sale to a specialty pharmacy that provides medications to patients primarily through the mail.  Bates Report, ¶ 51.

includes in its AMP calculation those sales for which there is adequate, verifiable documentation showing that the drug was actually distributed to a retail community pharmacy either directly or indirectly through the wholesaler. *Id*.; Def.'s 56.1 ¶ 37. As Impax points out, CMS has stated that it "believe[s] the better alternative for calculating AMP is the presumed inclusion approach." Pl.'s Response to Def.'s 56.1 ¶ 37; CMS Final Rule, 81 Fed. Reg. 5210.

CMS uses the AMP, among other things, to calculate a unit rebate amount ("URA") for each drug and transmits that information to the states. Pl.s 56.1 ¶ 11. Each state Medicaid agency then uses the data to calculate on a quarterly basis the rebate due from each manufacturer, by multiplying the state Medicaid utilization during that quarter times the URA in effect for that quarter. *Id*. ¶ 12. Because there is only one URA in effect for each quarter, manufacturers must pay that entire URA on each unit of the prescription drug bearing their labeler code that is paid for by a state Medicaid coverage program in that quarter—regardless of the price at which each unit was sold by the manufacturer and regardless of the amount a particular state paid to cover utilization of that unit. *Id*. ¶ 14. According to Impax, if a manufacturer fails to certify the Pricing Data or pay the Medicaid Rebate Liability due, it may be subject to, among other things, exclusion from the program, resulting in its drugs no longer being eligible for Medicaid coverage. Am. Compl. ¶ 21.

### B.  <u>Impax Acquires Daraprim</u>

In March 2015, Impax acquired all outstanding shares of common stock of Tower Holdings, Inc. and certain of its subsidiaries, including Amedra Pharmaceuticals LLC ("Amedra"), for approximately $691.3 million. Def.'s 56.1 ¶ 1. By way of this transaction, Impax acquired the U.S. marketing rights for Daraprim, an antiprotozoal medication mainly used to treat toxoplasmosis, a high risk and often times life-threatening disease for those affected by

HIV, AIDS, cancer, and other diseases weakening the immune system. Am. Compl. ¶¶ 14. Impax also acquired certain inventory of Daraprim, labeled with Amedra's labeler codes, and assumed Amedra's obligations under its Medicaid rebate agreement with HHS. *Id.* ¶ 16. Impax did not consider Daraprim a "strategic" part of its acquisition, and Daraprim was not part of its "core" business model. Def.'s 56.1 ¶ 2.

Prior to Impax's acquisition of the rights to Daraprim, Amedra had entered into and implemented an exclusive distribution agreement with Walgreen Co. ("Walgreens") for the distribution of Daraprim (the "Walgreens Distribution Agreement"). Def.'s 56.1 ¶¶ 4–5; Pl.'s Response to Def.'s 56.1. After acquiring Daraprim, Impax continued the exclusive distribution model with Walgreens. *Id.*

### C. **Turing Acquires Daraprim**

On April 22, 2015, Turing sent Impax a proposed offer to purchase Daraprim for $60 million—an amount that was six times Turing's estimate of Daraprim's annual net sales for 2014—and a term sheet representing "the current thinking of the parties." *See* Def.'s 56.1 ¶ 9; Pl.'s Response to Def.'s 56.1. During the negotiation of the Daraprim deal, Impax determined that it would have to increase the price of Daraprim by 300% to give Daraprim a net present value that was at least as much as what Turing was offering. Def.'s 56.1 ¶ 12. By July 21, 2015, Impax agreed to sell the rights to Daraprim to Turing for $55 million, eleven times Daraprim's 2014 annual net sales. *Id.* ¶ 13.

On August 7, 2015, Impax and Turing executed the Asset Purchase Agreement (the "APA") for the sale of the rights to Daraprim; the transaction closed on August 10, 2015 (the "Close"). Pl.'s 56.1 ¶ 1; Def.'s 56.1 ¶ 17. In addition to the rights to Daraprim, Impax

transferred inventory of 12,521 100-count bottles of Amedra-labeled Daraprim (the "Inventory") to Turing. Pl.'s 56.1 ¶ 1. Rather than require Turing to repackage the Inventory with Turing's own labeler codes right away, the APA permitted Turing to sell the Inventory labeled with Amedra's NDCs during a contractually prescribed timeframe (the "Sell-Off Period"). *Id.* at ¶ 2; APA § 8.5(a).

Under the Medicaid rebate program, state Medicaid agencies collect Medicaid Rebate Liability from the manufacturer under whose labeler code an NDC is registered. *See* Pl.'s 56.1 ¶ 12. Thus, Impax remained responsible for paying, in the first instance, all Medicaid Rebate Liability with respect to Amedra-labeled Daraprim. *See* Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment ("Pl.'s Mem.") at 2. The parties agreed that Turing would, in turn, reimburse Impax for certain Medicaid liabilities. *See* Def.'s 56.1 ¶ 20–21; Pl.'s Mem. at 2; APA § 9.2, Ex. E. This litigation concerns, in part, Impax and Turing's disagreement on the extent of Turing's reimbursement obligations under the APA.

In addition to paying Medicaid Rebate Liability invoices in the first instance, Impax remained obligated to certify the Pricing Data to CMS for Turing's sales of Amedra-labeled Daraprim. Pl.'s Mem at 1; Def.'s Mem. at 6; Pl.'s 56.1 ¶ 18; Def.'s 56.1 ¶ 34. Because Impax does not have access to Pricing Data for Turing's sales of Amedra-labeled Daraprim, Turing agreed to provide Impax with certified monthly and quarterly Pricing Data for Amedra-labeled Daraprim, which Impax is then responsible for reporting to CMS by entering it into the DDR system in accordance with CMS guidelines.[4] Pl.'s 56.1 ¶¶ 17–18.

---

[4] Impax claims that Turing failed to provide Pricing Data for the months of October and November 2015 and January, February, and March 2016, and certain quarterly data late and only after repeated demands. Am. Compl. ¶¶ 61, 84. According to Impax, this has "forced Impax to file data with CMS based on its best knowledge and without

### D. **Turing's Price Increase and its Effect on Medicaid Rebate Liability**

On August 11, 2015—one day after the Close of the APA—Turing raised the price of Daraprim from Impax's price of $17.63 per pill to $750 per pill. Pl.'s 56.1 ¶ 21. The parties agree that the APA placed no limitation on Turing's right to increase the price of Daraprim. Def.'s 56.1 ¶ 19. However, Turing's price increase had significant effects on Daraprim's AMP and the amount of Medicaid Rebate Liability invoiced by the state Medicaid agencies.

On October 28 and 29, 2015, Turing provided Impax with its certification of Pricing Data for the third quarter of 2015 ("Q3 2015")—including a quarterly AMP of $750—which Impax certified to CMS.[5] Pl.'s 56.1 ¶¶ 24–25. Based on that quarterly AMP, CMS calculated a quarterly URA for Daraprim of $750. Id. ¶ 25. As stated, CMS calculates a single URA for each drug manufacturer code for a given calendar quarter, which is used to calculate rebate liability for all Medicaid utilization of that drug during that quarter. Id. ¶ 26. Therefore, the $750 URA for Q3 2015—July, August, and September 2015—set the rebate price for all Daraprim utilized under Medicaid for that quarter, including Daraprim that was utilized before the August 10, 2015 Close. Id. According to Impax, Turing's increased price generated an increase in the Medicaid Rebate Liability Impax owed on Daraprim utilized before the Close. Pl.'s Mem. at 13. Turing disputes Impax's assertion that Medicaid Rebate Liability on pre-Close utilization would have been lower had Turing not increased the price of Daraprim. Def.'s Mem. at 19.

---

the certainty that compliance with the Purchase Agreement was designed to provide," exposing Impax to reputational harm and regulatory action. *Id.* ¶ 62, 64.

[5] Beginning in the third quarter of 2015, Turing calculated the Pricing Data for Daraprim using Medical Communications Technologies, Inc. ("MedComm"), a firm run by Randall Perry ("Perry"), who was authorized to report and certify the Pricing Data to Impax. Pl.'s 56.1 ¶ 22–23.

State Medicaid agencies have invoiced Impax over $19 million in Medicaid Rebate Liability with respect to Daraprim for Q3 2015. [6] Pl.'s 56.1 ¶ 27. On January 15, 2016, Impax sent Turing an invoice seeking reimbursement of approximately $17.8 million in Medicaid Rebate Liability for Q3 2015 (the "January Invoice"). *Id.* ¶ 28. The January invoice allocated Medicaid Rebate Liability between Impax and Turing in two steps. *Id.* ¶ 29. First, because Impax held the rights to Daraprim for 41 out of 92 days in Q3 2015, Impax took the total number of Daraprim units that state Medicaid agencies paid for in that quarter—in other words, Daraprim that was "utilized" in that quarter—and (1) assigned a prorated number of those units to Impax in a proportion to 41/92, and (2) assigned the remainder of those units to Turing. *Id.* For the units allocated to Turing, Impax assigned all Medicaid Rebate Liability at the $750 URA. *Id.* Second, in order to account for the fact that Turing's price increase resulted in an incremental increase in the URA applicable to the units allocated to Impax, the invoice (1) assigned Rebate Liability on those units to Impax at a URA of $14.47 (i.e., the URA equivalent to the last monthly AMP calculated by Impax prior to the Close, based on its own pricing of Daraprim), and (2) assigned the remainder (the "incremental rebate liability") to Turing. *Id.* ¶ 30.

On February 1, 2016, Turing provided and Impax certified an AMP of approximately $719.40 for the fourth quarter of 2015 ("Q4 2015"). *Id.* ¶ 34. Based on the URA calculated by CMS, the state Medicaid agencies have invoiced Impax approximately $11.5 million in Medicaid Rebate Liability for Q4 2015. *Id.* ¶ 36. On March 1, 2016, Impax invoiced Turing for an additional $2.4 in Medicaid Rebate Liability reimbursement for Q3 2015 and Q4 2015 (the "March Invoice"). *Id.* ¶ 37. The March Invoice allocated Medicaid Rebate Liability in the same

---

[6] According to Impax, had those units been invoiced to Impax based on Daraprim's pre-APA pricing, the total rebate liability for this period would have been just under $375,000. Am. Compl. ¶ 30.

manner as the January Invoice, except that all Rebate Liability on Daraprim utilized and paid for

by the state Medicaid agencies in Q4 2015 was assigned to Turing. *Id.* ¶ 38. On April 19, 2016,

Impax sent Turing a third invoice requesting an additional $10.2 million in previously

unaccounted-for Q3 2015 and Q4 2015 Medicaid Rebate Liability. *Id.* ¶ 40.

Turing similarly provided and Impax certified Pricing Data in April and July 2016,

representing the first and second quarters of 2016. Pl.'s 56.1 ¶¶ 43–44, 49. Based on that

Pricing Data and CMS's corresponding calculations, the state Medicaid agencies have invoiced

Impax approximately $14 million in Daraprim Medicaid Rebate Liability. *Id.* ¶¶ 45, 50–51. In

turn, Impax has billed Turing approximately $13 million in reimbursements for those quarters.

*Id.* ¶¶ 46, 52.

Since the Close of the APA, the state Medicaid agencies have invoiced Impax a total of

$45,412,214.07 in Medicaid Rebate Liability with respect to Daraprim. *Id.* ¶ 54. Impax has

invoiced Turing a total of $43,434,170.13 in reimbursements. *Id.* To date, Impax's invoices

remain outstanding. *See id.* ¶¶ 33, 39, 42, 48, 55.

### E.  Turing Demands a Restatement of the Pricing Data

After receiving the January Invoice, Turing consulted counsel at Reed Smith LLP ("Reed

Smith") and engaged the Berkeley Research Group ("BRG") to assess the Pricing Data that

Impax had submitted to CMS. Def.'s 56.1 ¶ 66. On February 16, 2016, Impax sent Turing a

letter demanding that Turing pay the January 2016 invoice. Am. Compl. ¶ 34. Instead of

responding to the letter, on March 22, 2016, Turing sent Impax a memorandum from Reed Smith

suggesting that Turing may have miscalculated the AMP, potentially resulting in an

overstatement of the total Medicaid Rebate Liability invoiced to Impax by the states and Turing's

share of that liability. Naftalis Decl. Ex. 31, TURING0004588. Turing also forwarded three alternative models prepared by BRG purportedly calculating the parties' respective rebate liability. Def.'s 56.1 ¶ 67. Turing told Impax that BRG's third model—which showed a total Medicaid Rebate Liability for Q3 2015 of $354,000 (significantly less than the original amount of upwards of $18 million invoiced by the state Medicaid agencies)—was the most appropriate alternative. *Id.*

By April 2016, Turing informed Impax that it had concluded that the Pricing Data it provided to Impax—and that Impax had certified to CMS—for Q3 and Q4 2015 was incorrect and that Impax should restate that Pricing Data. Def.'s Mem. at 8–9; Def.'s 56.1 ¶¶ 67–68. According to Turing, in Q3 and Q4 2015, state Medicaid agencies paid a total of $12.6 million for Daraprim, but—based on the erroneous numbers submitted by Turing to CMS via Impax— invoiced $31.1 million in rebates, resulting in a windfall to state Medicaid agencies of $18.5 million. Def.'s Mem. at n. 30.

On June 15, 2016, Turing formally demanded that Impax restate and recertify the Q3 and Q4 2015 Pricing Data (the "Restatement Demand"). Pl.'s 56.1 ¶ 62; Def.'s 56.1 ¶ 70. Specifically, Turing demanded that Impax submit a restated AMP of approximately $14, a number significantly lower than the AMPs of $750 and $719.40 that Impax had previously submitted.[7] Pl.'s 56.1 ¶ 62. Impax has not reported the new Pricing Data. Def.'s 56.1 ¶ 74.

---

[7] Turing asserts that it reached this conclusion by using the build-up methodology, instead of the presumed inclusion methodology that its vendor, MedComm, originally used. According to Turing, MedComm's original calculations were "replete with errors" that led to overstated rebate liability. Turing claims that in correcting the erroneous Pricing Data, it determined that the buildup methodology was appropriate because Turing did not sell Daraprim to any retail community pharmacies during the relevant time period. Using the buildup approach, Turing determined that none of its sales of Daraprim in Q3 2015 and Q4 2015 qualified for inclusion in its AMP calculation because none were to: (1) wholesalers for distribution to retail community pharmacies; or (2) directly to retail community pharmacies. Without any AMP-eligible sales, Turing carried forward the AMP calculated for Daraprim in the second quarter of 2015. Def.'s Mem. at 32–33.

Together with the Restatement Demand, Turing sent Impax a check for $150,222, which it stated reflected its share of the recalculated Medicaid Rebate Liability. Def.'s 56.1 ¶ 70; Naftalis Decl. Ex. 34. Turing took the position that not only was the total Medicaid Rebate Liability overstated due to a calculation error, but that Impax had not allocated responsibility for that liability between the parties in accordance with the APA. Def.'s Mem. at 8. Impax had allocated responsibility based on its belief that Turing is responsible for (1) all Medicaid Rebate Liability assessed on Daraprim utilized after the Close, including Daraprim that Impax sold into distribution channels before the Close; and (2) the increase in Medicaid Rebate Liability owed on pre-Close utilization of Daraprim caused by Turing's post-Close price increase (i.e., the incremental rebate liability). Pl.'s Mem. at 6; Def.'s Mem. at 11.

Turing's June 15, 2016 check reflected its belief that it is only responsible for Medicaid Rebate Liability assessed on Daraprim that Turing sold into distribution channels after the Close. *See* Def.'s 56.1 ¶ 70–72. Even under the proposed restatement—which, according to Turing, results in no incremental rebate liability with respect to Daraprim utilized before the Close[8]— Turing refused to reimburse Impax for liability assessed on Daraprim sold before the Close and utilized after the Close. *See id*.

## II. Procedural Background

On May 2, 2016—after Impax demanded that Turing pay its share of the Medicaid Rebate Liability, but before Turing officially demanded that Impax restate and recertify the Q3 and Q4 2015 Pricing Data—Impax brought the instant suit against Turing, seeking a declaratory judgment that Turing breached the APA by failing to provide timely and accurate Pricing Data,

---

[8] *See supra* note 7.

an order compelling specific performance of Turing's reporting obligations under the APA, and damages for Turing's breach of the APA for, among other things, failing to reimburse Impax for its share of Medicaid Rebate Liability. Complaint (Doc. 1). Impax also sought a temporary restraining order and preliminary injunction ordering Turing to, among other things, stop selling Amedra-labeled Daraprim. *Id*. The Court denied the requests, finding that although Impax had established a likelihood of success on the merits, it failed to demonstrate irreparable harm. *See* Doc. 31 (May 10, 2016 Transcript); Doc. 29 (May 18, 2016 Transcript). On May 24, 2016, Turing filed its answer to the complaint, along with a counterclaim for Impax's alleged breach of the duty of good faith and fair dealing by refusing to engage with Turing to correct the errors in the Pricing Data. Answer with Counterclaim (Doc. 27). The parties thereafter began discovery.

On June 24, 2016, after Turing sent Impax its June Restatement Demand, Impax amended its complaint to add factual allegations and additional claims for breach of contract and unjust enrichment.[9] Doc. 34. Turing answered the Amended Complaint on July 11, 2016, adding a counterclaim for breach of contract based on Impax's refusal to restate the Pricing Data. Doc. 43. The Court dismissed Impax's unjust enrichment claim on November, 16, 2016. Doc. 99. The following claims and counterclaims remain:

1) Impax's claim for declaratory judgment that Turing breached Section 8.5 of the APA by failing to provide accurate and timely Pricing Data (Count 1);

2) Impax's claim for specific performance requiring Turing to perform its obligations under the APA to provide accurate and timely Daraprim Pricing Data on an ongoing basis (Count 2);

---

[9] Pursuant to the Walgreens Distribution Agreement, Walgreens was required, within 30 days of Turing raising the price of Daraprim, to pay Turing for the increased value of the inventory it held on hand, including inventory Walgreens originally purchased from Impax. Am. Compl. ¶ 28. According to Impax, Impax estimated that Walgreens was obligated to pay Turing approximately $73,000 per 100-count bottle of Daraprim at the time of the price increase to account for this shelf stock adjustment. *Id*. Impax's claim for unjust enrichment alleged that Turing received "a substantial windfall in the form of [Walgreen's] payment for the increased value of the inventory Impax sold to Walgreens that Walgreens still held on hand at the time of the price increase."

3) Impax's claim that Turing breached the APA by failing to reimburse Impax for Turing's share of Daraprim Medicaid Rebate Liability (Count 3);

4) Impax's claim, in the alternative, that Turing's certification of inaccurate Pricing Data is itself a breach of the APA (Count 4);

5) Turing's counterclaim that Impax breached the APA by refusing to restate the Pricing Data for Q3 and Q4 2015 (Count 1);

6) Turing's counterclaim that Impax breached the duty of good faith and fair dealing by refusing to restate the Pricing Data for Q3 and Q4 2015 (Count 2).

On October 14, 2016, Impax filed a motion for partial summary judgment on its claim that Turing breached the APA by failing to reimburse Impax for its share of Medicaid Rebate Liability (Count 3), and Turing's counterclaims for breach of contract and the implied duty of good faith and fair dealing (Counts 1 and 2). Doc. 78. Turing filed its opposition to Impax's motion one month later, together with a cross-motion for summary judgment on all of Impax's remaining claims (Counts 1–4) and Turing's counterclaim for breach of contract against Impax (Count 1). Doc. 92. The Court held oral argument on the parties' motions on September 26, 2017.

## III.  Legal Standards

To prevail on summary judgment, the movant must show that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A 'material' fact is one that might 'affect the outcome of the litigation under the governing law.'" *Id.* "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual

dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). On a summary

judgment motion, the district court "may not make credibility determinations or weigh the

evidence . . . . 'Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* at 545–46

(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis

omitted).

"When confronted with cross-motions for summary judgment, the Court analyzes each

motion separately, 'in each case construing the evidence in the light most favorable to the non-

moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1

(S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir.

2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach

party's motion must be examined on its own merits, and in each case all reasonable inferences

must be drawn against the party whose motion is under consideration.") (citation omitted). The

Court is not required to resolve the case on summary judgment merely because all parties move

for summary judgment. *Morales*, 249 F.3d at 121.

## IV.     Discussion

### A.     <u>Impax's Claim that Turing Breached the APA by Failing to Reimburse Impax for Turing's Share of Daraprim Medicaid Rebate Liability (Count 3)</u>

Impax moves for summary judgment on its third claim, which alleges that Turing

breached the APA by failing to reimburse Impax for its share of Daraprim Medicaid Rebate

Liability. Pl.'s Mem. at 5; Def.'s Mem. at 10. Turing cross-moves for summary judgment on the

same claim.

Under New York law, the "essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *LaRoss Partners, LLC v. Contact 911 Inc.*, No. 11 Civ. 1980 (ADS) (ARL), 2015 WL 2452616, at *6 (E.D.N.Y. May 21, 2015) (citing *Canzona v. Atanasio*, 118 A.D.3d 837 (2d Dep't 2014) (internal quotation marks omitted). A party "will not be able to prevail on its breach of contract claim unless it . . . proves, by a preponderance of the evidence, that it performed its own obligations under the contract." *Id.*; *see also Nature's Plus Nordic A/S v. Natural Organics, Inc.*, 980 F. Supp. 2d 400, 412 (E.D.N.Y. 2013) ("[I]n order to prevail on a breach of contract claim, a plaintiff must establish performance of each of its obligations under the contract, not just those obligations that the defendant previously cited as a basis for termination.").

Impax and Turing agree on several key issues. They agree that (1) the APA is an unambiguous contract, and that the proper interpretation of an unambiguous contract is a question of law for the Court, Pl.'s Mem. at 5; Def.'s Mem. at 10; (2) the APA is an enforceable contract, Pl.'s Mem. at 5; Pl.'s 56.1 ¶ 3; Def.'s Response to Pl.'s 56.1 ¶ 3; and (3) Turing is responsible for at least a portion of the Medicaid Rebate Liability invoiced by the state Medicaid agencies. Nonetheless, they dispute whether Turing is contractually obligated to pay any rebate liability on Daraprim sold by Impax but utilized after the Close, or any part of the rebate liability owed on Daraprim utilized before the Close in 3Q 2015.

In addition to arguing that it has not breached the APA by refusing to pay Impax's invoices, Turing argues—and counterclaims—that Impax itself breached the APA by refusing to restate and recertify the Pricing Data for Q3 and Q4 2015 to CMS. Doc. 43. Because Turing argues that Impax has not performed its own obligations under the APA, in determining whether

summary judgment on Impax's breach of contract claim is proper, the Court must consider whether Impax has itself failed to perform its obligations under the APA such that it would not be able to prevail on its breach of contract claim.

### i. Impax's Claim that Turing Failed to Pay its Share of Medicaid Rebate Liability

Impax argues that Turing is contractually obligated to pay: (a) all Medicaid Rebate Liability assessed on Daraprim utilized after the Close; and (b) the incremental rebate liability assessed on Daraprim utilized before the Close that was generated by Turing's price increase. Pl.'s Mem. at 6. Turing, on the other hand, argues that the APA limits Turing's rebate obligations to rebate liability assessed on Daraprim that Turing itself sold into distribution channels after the Close, and that Turing is not responsible for *any* portion of rebate liability assessed on Daraprim that Impax sold into distribution channels. Def.'s Mem. at 11. This, Turing asserts, includes the incremental rebate liability assessed on pre-Close utilization caused by Turing's price increase. *See id.* at 11, 19. The Court discusses whether Turing is responsible for either category of liability in turn.

### a. Medicaid Rebate Liability assessed on Daraprim utilized after the Close

In support of its contention that Turing is responsible for Medicaid Rebate Liability for Daraprim sold by Impax into distribution channels before the Close but utilized after the Close, Impax points to Section 9.2(d) and Exhibit E of the APA. Pl.'s Mem. at 6–9. Section 9.2(d) addresses the allocation of Medicaid Rebate Liability between Impax and Turing during the Sell-Off Period, providing that:

> [O]n and after the Closing Date, (i) [Turing] shall have responsibility and shall assume all Liabilities for, all Rebates, Chargebacks, and Adjustments made after

16

the Closing Date for Products sold on or after the Closing Date and (ii) [Impax] shall have responsibility to process, and assume all Liability for all Rebates, Chargebacks, and Adjustments made after the Closing Date for Products sold prior to the Closing Date. Exhibit E hereto sets out the roles and responsibilities for each of [Impax and Turing] in connection with the administration of this Section 9.2 during the Sell-Off period. APA § 9.2(d).

According to Impax, Section 9.2(d)'s reference to "[p]roducts sold on or after the Closing Date" does not specify which "sale" must occur before or after the Close (i.e., sales by Impax or Turing, or sales further down the supply chain). In contrast, Impax argues, other provisions are "abundantly clear on that same point." Pl.'s Mem. at 7. For example, portions of Section 2.4 expressly cover Daraprim "*sold by Buyer* on or after the Closing Date" and Sections 9.2(b) and (c) state that Impax "shall be financially responsible for returned Product . . . *sold by Seller* prior to the Closing Date" while Turing "shall be financially responsible for all returned Product *sold by or on behalf of Buyer* on or after the Closing Date." Pl.'s Mem. at 7–8; APA §§ 2.4(a), 9.2(b)–(c).

According to Impax, Section 9.2(d) expressly directs the parties to Exhibit E of the APA for "needed clarity" regarding the type of "sale" that determines the allocation of Medicaid Rebate Liability between Impax and Turing during the Sell-Off Period. Pl.'s Mem. at 8. Exhibit E, in turn, lists a series of "assumptions" for the Sell-Off Period, including that:

[Turing] shall be responsible for reimbursing [Impax] for all rebates on *utilization that takes place after the Close*. In the event that the Close takes place in the middle of a Quarter then [Turing] shall be responsible for a prorated amount of that Quarter[']s rebate invoices. APA Exhibit E (emphasis added).

Impax contends that "in calculating rebate liability, Exhibit E requires the use of the *assumption* that Turing is responsible for all liability on post-Close utilization."[10] *Id.* at 8. According to

---

[10] As discussed, Exhibit E includes an "Assumption" that "[u]pon Close Buyer shall be responsible for reimbursing Seller for *all rebates on utilization that takes place after the Close*." APA Exhibit E (emphasis added).

Impax, Exhibit E clarifies Section 9.2(d)'s reference to liability for "Product sold [before or after] the Closing Date"—it really means "Product *utilized* [before or after] the Closing Date." *Id*. Impax argues that "for [Exhibit E] to have any meaning, Turing must be held to its obligation to pay all Medicaid Rebate Liability triggered by utilization after the Close. Any other interpretation of the APA would render that language superfluous and would be contrary to fundamental principles of contract interpretation." Pl.'s Mem. at 6.

Turing, on the other hand, contends that "the APA unambiguously allocates the Daraprim rebate obligations between the parties based on when the manufacturer sold that product into distribution channels," not when the product was utilized. Def.'s Mem. at 11. Turing relies on Sections 2.4, 8.3, and 9.2(d) of the APA to support its position. Section 2.4(a) provides that:

> Subject to [Turing's] right to indemnification under Section 12.2(a), [Turing] will assume, be responsible for and pay, perform and/or otherwise discharge when due those Liabilities . . . directly arising out of or in connection with or primarily related to the Transferred Assets, the use thereof, or the marketing or sale of the Product or the use of the Transferred Product Technology by or on behalf of [Turing] or its Affiliates, arising and related solely to periods from and after the Closing Date, including . . . (iv) Rebates, Chargebacks, discounts, allowances, incentives and similar payments in connection with *the sale of Product on or after the Closing Date*. APA, § 2.4(a) (emphasis added).

Turing contends that Section 2.4(a)'s reference to the "sale of Product on or after the Closing Date" actually means "the sale of Product *by Turing into distribution channels*." *See* Def.'s Mem. at 11. Turing makes the same argument with respect to Section 9.2(d)'s language assigning Turing responsibility for rebates for Daraprim "sold" post-Close. *Id*. at 12 ("As this provision demonstrates, the parties expressly contemplated that both Impax and Turing would each bear responsibility for a portion of rebates depending on whether their sale of the drug into distribution channels took place before or after the Closing Date.").

Turing also argues that Section 8.3 of the APA "removes any ambiguity" about what the terms "sale" and "sold" mean in Sections 2.4(a) and 9.2(d), respectively. *Id.* at 12. Turing contends that Section 8.3 makes clear that Turing is *only* responsible for obligations owed to the government on Daraprim *sold by Turing*, which necessarily excludes Daraprim that Impax sold into distribution channels but was utilized after the Close. *Id.* Section 8.3 provides that:

> Notwithstanding any agreement between the parties to the contrary, from and after the Closing Date, except as set forth in this Agreement, [Turing] will assume control of, and responsibility for all costs and Liabilities arising from or related to any commitments or obligations owed to any Governmental Entity involving the Product, only to the extent arising from or relating to Product manufactured or sold by or on behalf of [Turing] or its Affiliates or their respective agents or assignees on or after the Closing Date. APA § 8.3.

According to Turing, Section 8.3 applies to Medicaid Rebate Liability because it is an obligation owed to a Governmental Entity. Def.'s Mem. at 13. Thus, Turing argues, Section 8.3 provides that Turing is responsible for Medicaid Rebate Liability, "*only* to the extent arising from or relating to [Daraprim] . . . *sold by or on behalf of [Turing] . . . after the Closing Date.*" *Id.* (emphasis added).[11]

Finally, Turing argues that Exhibit E does not require Turing to pay Impax for rebates on Impax's own sales of Daraprim. Def.'s Mem. at 16–17. Turing urges that Exhibit E must be "read in the context of the APA as a whole" and considering Exhibit E's purpose (i.e., to designate the parties' roles and responsibilities regarding Section 9.2 during the Sell-Off Period). *Id.* at 17. Turing contends that by reading Exhibit E to only apply to Daraprim Turing sells during the Sell-Off Period, "the terms of the APA and Exhibit E achieve a harmonious whole." *Id.* at 18. Turing also argues that Exhibit E does not purport to define the terms "sale" or "sold,"

---

[11] Impax does not contend that Section 8.3 is inapplicable to Medicaid Rebate Liability. Pl.'s Reply at 11. Instead, Impax argues that Section 8.3 "is effective *only insofar as the APA does not set forth otherwise*," which the APA does in both Section 2.4(a) and Exhibit E. *Id.* Moreover, Impax argues, Section 9.2(d) expressly refers to Exhibit E—and not Section 8.3—for clarification. *Id.*

and that the relevant language only describes an "assumption"—"not a right, obligation, promise, warranty, representation or undertaking of any kind." *Id.* According to Turing, Exhibit E merely reflects that the parties "took for granted" that Turing would be responsible for Medicaid Rebate Liability assessed on its sales of Daraprim after the Close, which would necessarily also be utilized after the Close. *Id.* Turing contends that in light of Sections 2.4(a), 8.3, and 9.2(d) of the APA, that assumption is "invalid" with respect to Daraprim previously sold by Impax or Amedra. *Id.*

Based on the plain language of the APA, Turing's interpretation of the allocation of Medicaid Rebate Liability with respect to Daraprim sold into distribution channels by Impax and utilized after the Close is untenable. Turing's argument that Sections 2.4 and 9.2(d) limit Turing's rebate liability to Daraprim sold "*by Turing into distribution channels*" is unconvincing because the terms "by Turing" and "into distribution channels" are simply nowhere to be found in the relevant provisions. Tellingly, other provisions in the APA allocating responsibilities between Impax and Turing based on which party sold Daraprim are abundantly clear.[12]

Moreover, to follow Turing's interpretation of the "utilization" language in Exhibit E would render it entirely superfluous. As Impax argues, Daraprim that was sold into distribution channels after the Close is also necessarily utilized after the Close. Pl.'s Mem. at 6. If, as Turing argues, the APA limits Turing's obligations to rebate liability assessed on sales made by Turing after the Close, then also making Turing "responsible for all rebates on utilization that takes place after the Close" would be superfluous. *Id.* Such an interpretation would be contrary to

---

[12] Section 2.4(a)(i) assigns to Turing liability arising from claims or lawsuits related to Daraprim sold *by Turing* after the Close. Section 2.4(a)(ii) assigns to Turing liability arising from any governmental action related to Daraprim sold *by Turing* after the Close. Section 2.4(a)(iii) assigns to Turing liability arising from product liability claims relating to Daraprim sold *by Turing* after the Close. Section 9.2(b) provides that Turing shall be responsible for all returned Daraprim *sold by or on behalf of Turing* after the Close.

established Second Circuit law.  *See, e.g., LaSalle Bank National Association v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.") (internal quotation marks and citation omitted).

The Court also disagrees with Turing's argument that Section 8.3 resolves any ambiguity with respect to the terms "sold" and "sale" in Sections 2.4(a) and 9.2(d).  Section 9.2(d), which explicitly deals with Medicaid rebates, directs the parties to Exhibit E—and not Section 8.3—for any necessary clarification.  Indeed, Section 9.2(g) instructs that in the event of a conflict between Section 9.2 and Exhibit E, "the provisions of Exhibit E shall govern."  Moreover, Turing's argument that Section 8.3 *limits* Turing's responsibility to obligations arising from the sale of Daraprim by Turing is unavailing.  By its express terms, Section 8.3 provides that it is effective only insofar as the APA does not set forth otherwise.  It is evident that the parties provided otherwise in Exhibit E.  As Impax points out, "for the words [in Exhibit E] to have any meaning, Turing must be held to its obligation to pay all Medicaid Rebate Liability triggered by utilization after the Close."  Pl.'s Mem. at 6.

      b.   *Medicaid Rebate Liability assessed on Daraprim utilized before the Close*

With respect to the incremental Medicaid Rebate Liability on pre-Close utilization of Daraprim caused by Turing's post-Close price increase, [13] Impax contends that Section 2.4(a) and Exhibit E assign responsibility to the party that created it (i.e., Turing).  Pl.'s Mem. at 13.  Impax

---

[13] Turing challenges Impax's claim that Medicaid Rebate Liability on pre-Close utilization would have been lower had Turing not increased the price of Daraprim.  *See* Def.'s Mem. at 19.

claims that "under Section 2.4(a), Turing is responsible for its own actions." *Id*. Section 2.4(a)

provides that:

> [Turing] will assume, be responsible for and pay, perform and/or otherwise
> discharge when due those Liabilities . . . *directly arising out of or in connection*
> *with or primarily related to . . . the marketing or sale of [Daraprim]* . . . by or on
> behalf of [Turing] or its Affiliates, *arising and related solely to periods from and*
> *after the Closing Date*, including [...]. APA § 2.4(a) (emphasis added).

Impax argues that because the Medicaid Rebate Liability assessed on Daraprim utilized before

the Close would have been significantly lower had Turing not raised the price, the incremental

rebate liability at issue "arose" from the marketing and sale of Daraprim after the Close, and is

thus Turing's to bear. *See* Pl.'s Reply at 8. To be sure, Section 2.4(a) does not expressly state

that Turing is "responsible for its own actions" or that responsibilities are assigned to "the party

that created" them. The language of Section 2.4(a) is not that broad. Rather, Impax seems to

suggest that Turing is liable for the incremental rebate liability because its price increase was part

of its "marketing or sale" of Daraprim after the Close. Pl.'s Reply at 9. In its Reply, Impax cites

the dictionary definition of "marketing" as "(i) the act or process of selling or purchasing in a

market, and (ii) the process or technique of promoting, selling, and distributing a product or

service." *Id*.; *see also* Naftalis Reply Decl., Ex. 3. Impax contends that these definitions, on

their face, include Turing's pricing point for Daraprim. Pl.'s Reply at 9.

Impax further contends that Exhibit E also holds Turing responsible for the incremental

Medicaid Rebate Liability generated by Turing's price increase. Pl.'s Mem. at 14. Exhibit E

provides that:

> "[Turing] shall be responsible for reimbursing [Impax] for all rebates on utilization
> that takes place after the Close. In the event that the Close takes place in the middle
> of a Quarter ***then [Turing] shall be responsible for a prorated amount of that***
> ***Quarter[']s rebate invoices***." APA Exhibit E (emphasis added).

Impax relies on the word "prorated" and its dictionary definition: "to divide, distribute, or assess proportionally (i.e., in a correct or appropriate relationship between the size and position of different parts)." Pl.'s Mem. at 14 (citing the Merriam-Webster Dictionary definitions of "Prorate" and "Proportion"). Impax contends that in order to give "prorated" its plain meaning, "Medicaid Rebate Liability must be distributed proportionally between Impax and Turing—*with each party bearing its fair share*." *Id.* at 15. According to Impax, Turing's "fair share" includes the additional Medicaid Rebate Liability on pre-Close utilization that Turing created by increasing the price of Daraprim. *Id.*

Turing contends that even if Medicaid Rebate Liability on pre-Close utilization would have been lower had Turing not increased the price of Daraprim, "nothing in the APA or Exhibit E entitles Impax to shift all or a portion of its rebate liability to Turing based on Turing's absolute right under the APA to increase the price of Daraprim." Def.'s Mem. at 19. First, Turing describes the relevant portion of Section 2.4(a) as "general introductory language," appearing to suggest that it does not set forth any obligations and that Section 2.4(a)'s obligations are only found in its subsections (i) through (iv). *Id.* at 20. Turing further argues that even if Impax could rely on the general introductory language, Section 2.4(a) does not assign incremental rebate liability to Turing because that liability does not arise from Turing's marketing or sale of Daraprim: that Daraprim was sold by Impax and "marketing" does not include Turing's price increase.[14] *Id.* Moreover, Turing argues, Section 2.4(a) "assigns liability to Turing only if it arises and is related *solely* to periods from and after the [Close]." *Id.* Turing contends that since

_____

[14] In its Opposition memorandum, Turing contends that Impax failed to define "marketing" or explain why Turing's price increase should be subsumed within that term. Def.'s Mem. at 20. Turing further contends that, in any event, Section 2.4(a)(i)-(ii) demonstrates that the term "marketing" concerns activities regulated by the FDA or other governmental entities, and does not include pricing decisions by Turing. *Id.* In its Reply, Turing does not address Impax's contention that a price increase by Turing falls under the dictionary definition of "marketing."

the rebate liability at issue is related to sales made by Impax before the Close, it is not *solely* related to the post-Close period and is therefore not Turing's responsibility. *Id*. at 20–21.[15]

With respect to Exhibit E, Turing argues that Impax's reliance on the word "prorate" is misplaced. According to Turing, Exhibit E "does not mention splitting between Impax and Turing a rebate on a particular sale of Daraprim." *Id*. at 21. Instead, "proration" is needed because both Impax and Turing sold Amedra-labeled Daraprim in Q3 2015 and certain of that Daraprim was utilized after the Close. *Id*.

The Court finds that Exhibit E does not assign to Turing responsibility for incremental rebate liability assessed on pre-Close utilization that may have been generated by Turing's price increase. The purpose of "proration" in the relevant portion of Exhibit E was to account for rebate liability on Daraprim sold by Impax but utilized after the Close. The "proration" language immediately follows the sentence stating that Turing is responsible for rebates on post-Close utilization, indicating that it was meant to qualify and provide additional instruction on the preceding sentence. Thus, it is evident that the "proration" language only addresses the issue of post-Close utilization and is wholly irrelevant to the distribution of liability assessed on Daraprim that was utilized before the Close.

However, the Court does find that pursuant to Section 2.4(a), Turing is responsible for the incremental rebate liability assessed on pre-Close utilization arising from Turing's price increase. At the outset, the Court notes that the portion of Section 2.4(a) at issue is not merely "general introductory language," as Turing suggests. Section 1.2—which sets forth the defined terms of

---

[15] On this point, Impax argues that the incremental rebate liability at issue did not exist before Turing raised the price of Daraprim. Pl.'s Reply at 9. Thus, Impax argues, under any reading of Section 2.4(a), "Turing caused that incremental liability [by raising the price of Daraprim] and must be held responsible for it." *Id*.

the APA—provides that the word "including" will be deemed to be followed by the words "without limitation."  Thus, the Court agrees with Impax that Section 2.4's list of liabilities arising or related to the post-Close time period is not exhaustive.

Based on the plain language of the relevant portion of Section 2.4(a), Turing is responsible for the liability at issue if that liability was generated *solely* by Turing's "marketing or sale" of Daraprim.  First, the Court finds that Turing's price increase was part of its "marketing or sale" of Daraprim.  As Impax points out—and Turing does not contest in its Reply—the dictionary defines "marketing," in part, as the act, process, and technique of promoting and selling a product.  Price point is necessarily part of the act, process, and technique of promoting and selling a product, and is therefore part of its marketing.[16]  Second, the Court finds that the liability at issue was generated *solely* by Turing's price increase.  Impax does not seek reimbursement for the full amount of rebate liability assessed on Daraprim that was sold in Q3 2015 and was utilized before the Close; it only seeks reimbursement for the incremental liability, if any, that was generated by Turing's post-Close increase.[17]  That incremental liability would not exist if Turing had not raised the price of Daraprim, and thus "arises" from Turing's post-Close "marketing or sale" of Daraprim.  Therefore, Turing's contention that it is not responsible for any rebate liability on pre-Close utilization because that liability is also related to

---

[16] Other sources explicitly include price point in the definition of "marketing."  For example, businessdictionary.com defines "marketing" as "the coordination of four elements called the 4 P's of marketing: (1) identification, selection and development of a **product**, (2) determination of its **price**, (3) selection of a distribution channel to reach the customer's **place**, and (4) development and implementation of a **promotional strategy**." http://www.businessdictionary.com/definition/marketing.html (emphasis in the original).  Investopedia.com also refers to "product, place, price and promotion" as the "four P's of marketing." http://www.investopedia.com/terms/m/marketing.asp.

[17] According to Turing, if Impax accedes to its request to restate the Pricing Data for 3Q and 4Q 2015, there would be no "incremental liability."

pre-Close activity by Impax—i.e., it would not exist had Impax not sold the Daraprim in the first place—is unavailing.

In sum, the Court finds that Turing is contractually obligated to reimburse Impax for (1) all Medicaid Rebate Liability assessed on Daraprim sold into distribution channels before the Close but utilized after the Close, and (2) any incremental rebate liability that its price increase may have generated with respect to Daraprim utilized before the Close.[18]  While Turing disputes the total Medicaid Rebate Liability on the ground that it is based on a calculation error, the Court finds that Turing has nevertheless breached its reimbursement obligations.  Turing has repeatedly denied any obligation to reimburse Impax for liability assessed on Daraprim sold by Impax into distribution channels but utilized after the Close and the incremental liability generated by its price increase.  Indeed, Turing sent Impax a check that explicitly excluded reimbursement for these categories of rebate liability.  Def.'s 56.1 ¶ 70.  Accordingly, Turing has breached its reimbursement obligations under the APA by refusing to reimburse Impax for any rebate liability assessed by the state Medicaid agencies on Daraprim sold into distribution channels by Impax but utilized after the Close and the incremental rebate liability resulting from its post-Close price increase.

In any event, even if Impax's allocation of rebate liability were inconsistent with the APA, Turing has reimbursed Impax for the liability it *does* accept only to the extent it is based on the URA that would be calculated using the proposed restated Pricing Data.  Def.'s 56.1 ¶¶ 71(c), 72(c) ("Turing multiplied the corrected URA (based on the Corrected Pricing Data) by the

_____

[18] This includes liability assessed on Daraprim with the NDC 52054-0330-10 (the "NDC-10 Product").  The liabilities assigned in Sections 2.4(a) and 9.2(d) apply to "Product," which in turn is defined as "Daraprim . . . as such Product exists as of [August 7, 2015].  APA § 1.1.  The APA does not limit these liabilities to a particular NDC, nor does it limit their allocation to the party that placed the Daraprim into the stream of commerce.

number of units allocated to Turing [to arrive at the dollar amount of Turing's share of total Medicaid rebate liability for Q3 and Q4 2015].").  Indeed, Turing admits that it has refused to pay Impax's 3Q and 4Q 2015 invoices, in part, because "the total amount of Medicaid rebate liability in those invoices was grossly inflated because it was based on an incorrect AMP . . . ." Naftalis Decl., Ex. 28.  Nothing in the APA allows Turing to refuse reimbursing Impax for liability already invoiced by the state Medicaid agencies—and paid in the first instance by Impax[19]—pending a restatement.  Pursuant to Exhibit E of the APA, Turing must reimburse Impax for all Medicaid rebates 30 days from the date of an invoice.  APA, Ex. E.  Accordingly, Turing's restatement demand does not relieve Impax of its reimbursement obligations, and by only reimbursing Impax based on a "corrected" URA, Turing has failed to perform under the APA.

While the Court finds that Turing has breached the APA, in order to award summary judgment in favor of Impax it must also determine that Impax performed its own obligations under the APA, a question to which the Court now turns.

### ii. Impax's Performance of its Obligations under the APA

Turing contends that Impax breached and continues to breach its obligations under the APA by refusing to restate the Pricing Data for Q3 and Q4 2015.  Def.'s Mem. at 29.  Impax, on the other hand, argues that (1) the APA does not require Impax to restate Pricing Data at all, and (2) even if the APA does require Impax to restate, it does not require Impax to submit a

---

[19] As Impax points out—and Turing does not dispute—Impax is required to continue paying the Medicaid Rebate Liability invoiced by the states while a restatement is pending.  Pl.'s Mem. at 24.

restatement if Impax has subjectively reasonable concerns about the restatement. *See* Pl.'s Mem. at 19–24; Pl.'s Reply at 20–27.

Impax contends that "nowhere does the APA require that Impax restate Pricing Data." Pl.'s Mem. at 19. Instead, Impax argues, Turing attempts to infer an obligation to restate from Impax's obligation to report and certify Pricing Data in the ordinary course.[20] *Id.* Turing, on the other hand, contends that while the APA does not expressly refer to restatements of Pricing Data, Impax ignores the plain language of Section 9.2(e) of the APA, which states that after the Close:

> [Impax] shall maintain responsibility for reporting *all* information relating to Product bearing Amedra's NDC number or any foreign counterpart and the prices thereof *under applicable rules and regulations* to the Medicaid Drug Rebate Program . . . . APA § 9.2(e) (emphasis added).

According to Turing, one such regulation contemplated by Section 9.2(e) is 42 C.F.R. § 447.510(b), which provides that a drug manufacturer "*must* report to CMS *any revision to AMP*, best price customary prompt pay discounts, or nominal prices for a period not to exceed 12 quarters from the quarter in which the data were due." 42 C.F.R. § 447.510(b) (emphasis added). As stated, the data that Turing seeks to have Impax restate is the AMP for Q3 and Q4 2015.

In light of Section 9.2(e) and the regulatory scheme it contemplates, the Court finds that an obligation to report Pricing Data revisions, including by way of a restatement, is subsumed within Impax's obligation to report "all information relating to Product bearing Amedra's NDC number and the prices thereof . . . to the Medicaid Drug Rebate Program." Contrary to what Impax suggests, Section 9.2(e) does not limit Impax's reporting obligations to information "in

---

[20] Impax contends that "the only (oblique) reference to something akin to a restatement is Exhibit E's requirement that '[Impax] will dispute Medicaid claims upon [Turing's] request and only for extraordinary quantities.'" Pl.'s Mem. at 20. Impax argues that this provision is unhelpful to Turing because the hypothetical "dispute" to which it refers concerns the number of units paid for by Medicaid in a quarter, and Turing's basis for a restatement here is that the Pricing Data it previously provided was "wrong." *Id.* Turing does not rely on Exhibit E to establish Impax's restatement obligation, thus the Court need not make a determination on this point.

the ordinary course," and it expressly contemplates the need to comply with applicable rules and regulations such as 42 C.F.R. § 447.510(b), which requires the reporting of revisions to AMP.

The Court does agree with Impax that the APA does *not* require Impax to blindly report any Pricing Data Turing provides. *See* Pl.'s Reply at 20. As Impax indicates—and Turing does not appear to challenge—Impax is only required to report Pricing Data that is consistent with applicable rules and regulations. *See id.*; Def.'s Reply at 7. Section 9.2(e) of the APA provides that Impax "shall maintain responsibility for reporting [Pricing Data] *under applicable rules and regulations* to the Medicaid Drug Rebate Program" (emphasis added), and Exhibit E provides that Impax shall "[e]nter all applicable information into DDR and certify *in accordance with CMS guidelines.*" *Id.* at 20 (emphasis added). Accordingly, Impax is under no contractual obligation to submit a restatement that does not comply with applicable rules and regulations.

But it does not follow, as Impax argues, that Impax may refuse to restate if it has "subjectively reasonable" concerns about restating, even if the Pricing Data is objectively accurate and complies with applicable rules and regulations. Pl.'s Reply at 21 ("[I]t is insufficient for Turing to show that Impax's concerns are objectively wrong . . . rather, Turing must demonstrate that they are *subjectively unreasonable*. In other words, Turing must show that Impax exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive Turing of the benefits of the fruit of its bargain.").

In support of its position, Impax relies on *Greenwood v. Koven*, 880 F. Supp. 186 (S.D.N.Y. 1995), a district court decision with a very different set of facts and legal questions than the ones at hand. In *Greenwood*, contractual language gave a party authority to rescind a sale if the party "in its sole judgment" determined that the sale may subject it to liability. *Greenwood*, 880 F. Supp. at 192. In deciding that a subjective standard—and not an objective

one—applied in analyzing the propriety of the party's exercise of this judgment, the court found that the contractual language clearly indicated "that *only* [the party's] judgment was to be relevant in its determination as to potential liability." *Id.* at 196–97. Thus, the court held that the relevant question was whether the party was "honestly" dissatisfied that the sale would not subject it to liability, not whether that dissatisfaction was objectively reasonable. *Id.* at 199–200.

In the instant case, the APA does not allow Impax to refuse to report Pricing Data to CMS based on its "sole judgment." Instead, Impax *must* certify information that is consistent with CMS rules and regulations. If the data is accurate and complies with applicable rules and regulations, then Impax *must* report it.[21] Accordingly, the appropriate inquiry in determining whether Impax's refusal to restate is a breach of the APA is whether the proposed restatement *objectively* complies with applicable rules and regulations, not whether Impax has subjectively reasonable concerns.

In its various submissions, Impax never outright contends that Turing's proposed restatement is inaccurate or fails to comply with applicable rules and regulations. *See* Pl.'s Mem. at 21 ("[The APA] does not compel Impax to restate facially inappropriate Pricing Data proffered by Turing where doing so *could* be contrary to law." (emphasis added); *Id.* at 22 ("Here, the undisputed facts demonstrate that Turing's restatement demand is both unreasonable and *could* violate the law.") (emphasis added). Instead, Impax argues that it has "reasonable and

---

[21] Tellingly, in oral argument before this Court in connection with its request for a preliminary injunction, Impax described its role under the APA with respect to Pricing Data as "purely ministerial" and stated that it must "mechanically" report the data that Turing certifies to it. *See* Naftalis Decl. Ex. 39, May 18, 2016 Hearing Transcript 3:1-4, 4:22-25, 5:7-9, 19:25-20:1. Impax's contention that it may refuse certifying Pricing Data to CMS based on its subjectively reasonable concerns is in clear tension with its previous representations regarding its "mechanical" role in the reporting process.

well-founded" concerns about submitting the restatement.[22]  Because Impax does not ground its refusal to submit the proposed restatement on the basis that its methodology is contrary to applicable rules and regulations—and instead insists that its subjectively reasonable concerns are a sufficient basis to refuse restating—no genuine issue of material fact remains with respect to this portion of the dispute.[23]  In other words, Impax's "strong reservations that [the restatement] is reasonable and consistent with the intent of the Medicaid program," Pl.'s Mem. at 26, are not a sufficient basis to refuse submitting Turing's proposed restatement.  Impax has an obligation to restate Pricing Data that complies with applicable rules and regulations.

Impax's only concrete objection to the lawfulness of the proposed restatement is its assertion that Impax sold Daraprim to Walgreens Specialty Pharmacy, which in turn transferred 16 to 17 percent of that Daraprim to local Walgreens storefronts in 3Q and 4Q 2015.  Pl.'s Reply at 24.  According to Impax, these storefronts qualify as retail community pharmacies—because they do not primarily sell prescription medicines through the mail—and are thus includable in AMP calculations.  *Id*. at 24–25.  Impax also points out that in calculating AMP for Daraprim sold under its own NDC in the first and second quarters of 2016, Turing included sales to those exact same storefront pharmacies when they purchased Daraprim directly from Turing's wholesaler (instead of indirectly though Walgreens Specialty Pharmacy).  *Id*. at 25.

---

[22] For example, Impax contends that:  (1) the restatement would "expose Impax to unreasonable regulatory risk" because of its "curious" timing (Pl.'s Reply at 22–23); (2) Impax has "strong reservations that it is reasonable and consistent with the intent of the Medicaid program for Turing to report an AMP that is entirely divorced from Turing's commercial prices for Daraprim" (*Id*. at 25–26); (3) Impax has "serious concerns" that Turing's decision to carry forward a prior period AMP "begs for substantial regulatory scrutiny" (*Id*. at 26).

[23] When pressed on this issue during oral argument, Impax did not offer any particular reason for why Turing's methodology and proposed restatement are inconsistent with applicable CMS rules and regulations.  Instead, Impax generally characterized Turing's restatement demand as "indefensible" and "cockamamie."

Walgreens Specialty Pharmacy's subsequent transfers of Daraprim to retail community pharmacies in 3Q and 4Q 2015 are of no consequence to Turing's AMP calculation. *See* Def.'s Reply at 9. As stated, AMP is defined as the average price paid to the manufacturer by (1) wholesalers that distributed the drug to retail community pharmacies, and (2) retail community pharmacies that purchased the drug directly from the manufacturer. Def.'s 56.1 ¶ 35; 42 U.S.C. § 1396r-8(k)(1)(A). Walgreen's internal transfers do not fall into either category because (1) they were not distributed by a wholesaler, and (2) they were not direct sales by Turing to retail community pharmacies. This also explains Turing's inclusion in its AMP of sales to those exact same pharmacies in the first and second quarters of 2016: the sales were AMP-eligible in 2016 because they flowed directly from Turing to retail community pharmacies; but they were ineligible in 2015 because they were internal transfers from Walgreens Specialty Pharmacy fulfillment sites. Moreover, as Ms. Bates—Turing's expert witness—suggests, that Walgreens Specialty Pharmacy redistributed a minority of Daraprim (i.e. 16 to 17 percent) in 3Q and Q4 2015 to brick-and-mortar storefronts does not alter the fact that Walgreens Specialty Pharmacy dispensed medications *primarily* through the mail, and accordingly, does not qualify as a retail community pharmacy. *See* Bates Rebuttal Report ¶ 15.

In sum, the Court finds that (1) Impax's subjectively reasonable concerns are not a sufficient basis to refuse submitting Turing's proposed restatement, and (2) Impax has not established that the proposed restatement is inconsistent with applicable rules and regulations. Therefore, the Court finds that by refusing to restate the Pricing Data for Q3 2015 and Q4 2015 as Turing requests, Impax has failed to perform its own contractual obligations and is unable to recover on its breach of contract claim. Accordingly, Impax's motion for summary judgment on its breach of contract claim is DENIED and Turing's motion is GRANTED.

**B. Turing's Counterclaim that Impax Breached the APA by Refusing to Restate the Pricing Data for Q3 and Q4 2015 (Counterclaim 1)**

As stated, the Court has found that (1) Turing breached the APA by refusing to reimburse Impax for Medicaid Rebate Liability assessed on Daraprim sold by Impax but utilized after the Close and the incremental rebate liability generated by Turing's price increase, and (2) Impax breached the APA by refusing to restate the Pricing Data for Q3 and Q4 2015. Because Turing has failed to perform its obligations under the APA, like Impax, Turing is unable to prevail on its breach of contract claim against Impax as a matter of law. *LaRoss*, 2015 WL 2452616, at *6 ("[A party] will not be able to prevail on its breach of contract claim unless it . . . proves, by a preponderance of the evidence, that it performed its own obligations under the contract."). Accordingly, Turing's motion for summary judgment on its breach of contract claim against Impax (Counterclaim 1) is DENIED and Impax's motion is GRANTED.

**C. Turing's Counterclaim that Impax Breached the Duty of Good Faith and Fair Dealing by Refusing to Engage with Turing to Correct the Errors in the Pricing Data (Counterclaim 2)**

Impax moves for summary judgment on Turing's counterclaim that Impax breached the duty of good faith and fair dealing on the ground that it is duplicative of Turing's breach of contract claim. Pl.'s Mem. at 21. "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Accident Insurance Co.*, 310 F.3d 73, 81 (2d Cir. 2002). As Turing points out, however, where a party relies on different facts for its claims of breach of contract and breach of the implied duty of good faith and fair dealing, New York courts routinely permit the party to proceed on both claims. Def.'s Mem. at 31; *see also Credit Agricole Corp. v. BDC Finance, L.L.C.*, 135 A.D.3d

561, 561 (N.Y. App. Div. 2016) (allowing claims for breach of contract and breach of the duty of good faith and fair dealing to proceed because they were sufficiently distinct). Turing contends that its claim for breach of the implied duty of good faith and fair dealing is distinct from its breach of contract claim because it is premised on Impax's alleged "refusal to work cooperatively with Turing to correct erroneous Pricing Data and rectify overstated government obligations as to which the parties share responsibility." Def.'s Mem. at 31.

At its core, Turing's claim that Impax breached the duty of good faith and fair dealing is premised on Impax's refusal to submit the proposed restatement. *See* Def.'s Answer with Counterclaims (Doc. 43) ¶ 134 ("Impax's refusal to take action to correct the erroneous Pricing Data it submitted to CMS, insistence that it will not take steps to correct that data . . . and threats to influence the federal government to stop covering Daraprim under government health-care programs are arbitrary, unreasonable, in bad faith and contrary to the public interest.). Impax's refusal to restate is also the basis of Turing's breach of contract counterclaim. Thus, the Court finds that Turing's counterclaims are duplicative and that Turing was not entitled to plead both claims in the instant action. Accordingly, Impax's motion for summary judgment on Turing's claim for breach of the duty of good faith and fair dealing (Counterclaim 2) is GRANTED.

### D. **Impax's Request for a Declaration that Turing Breached Section 8.5 by Failing to Provide Accurate and Timely Pricing Data (Count 1)**

Turing claims that it is entitled to summary judgment on Count 1 of Impax's Amended Complaint, which seeks a declaratory judgment that "Turing breached Section 8.5 of the APA and that, as a result, Impax may revoke any rights Turing was granted to use the Impax NDC's or other Corporate Names." Am. Compl. ¶ 80.

Section 8.5 of the APA grants Turing the right to sell Daraprim labeled with Impax's Corporate Names during the Sell-Off Period. APA § 8.5(a). In return, Turing agreed that it would "use best efforts not to do any act which endangers, destroys or similarly affects the value of the goodwill pertaining to [Impax's] Corporate Names" and that it would not use Impax's Corporate Names in any manner "inconsistent with [Impax's] use of the Corporate Names" or that violates applicable law. APA § 8.5(c). Section 8.5 further states that Impax may revoke Turing's rights to use Impax's Corporate Names "at any time upon breach by [Turing] of any provision of this Section 8.5." APA § 8.5(a).

Impax claims that Turing's late reporting of Pricing Data on repeated occasions "endangered Impax's ability to comply with its own reporting obligations to CMS," which in turn endangered the goodwill associated with Impax's Corporate Names and allowing Impax to revoke Turing's rights to use Impax's NDCs and Corporate Names. Turing contends that it is entitled to summary judgment because "Impax has failed to adduce *any* evidence that it suffered reputational harm as a result of Turing's reporting of Pricing Data." According to Impax, however, Section 8.5(a) allows Impax to revoke Turing's rights if Turing does anything to *endanger* goodwill, and does *not* require that Impax suffer actual reputational harm. Pl.'s Reply at 29–30 (citing APA § 8.5(c)).

The Court agrees that Impax need not establish actual reputational harm. The plain language of Section 8.5 allows Impax to revoke Turing's rights under that section if Turing fails to "use best efforts not to do any act which *endangers*, destroys or similarly affects the value of the goodwill pertaining to [Impax's] Corporate Names." APA § 8.5(a), (c). Whether Turing used "best efforts" and whether Turing's reporting delays endangered the goodwill associated with Impax's Corporate Names are questions of fact. Moreover, material issues of fact exist regarding

35

whether Turing's reporting delays amounted to the required endangerment.  For example, Impax

points to the deposition of Mr. Kane, who testified that "[w]e [Impax] have been put in

precarious positions by being late in our reporting as a result of Turing not meeting its reporting

obligations to Impax."  Kane Dep., 107:8–11.  Accordingly, Turing's motion for summary

judgment on Impax's claim for declaratory judgment (Count 1 of the Amended Complaint) is

DENIED.

### E. Impax's Claim for Specific Performance Requiring Turing to Provide Accurate and Timely Pricing Data (Count 2)

Count 2 of the Amended Complaint alleges that Turing violated Section 9.2 and Exhibit E

of the APA by failing to provide monthly certified Pricing Data for certain months, and providing

some Pricing Data late and only after repeated demands.  Def.'s Mem. at 39; Am. Compl. ¶ 84.

Impax, therefore, claims that it is entitled to specific performance of that provision on an

ongoing basis.[24]  Am. Compl. ¶ 84.

In its cross-motion for summary judgment on this claim, Turing states—and Impax does

not dispute—that since June 15, 2016, Turing has continuously provided Impax with accurate

and timely monthly and quarterly Pricing Data.  Def.'s Mem. at 39.  Turing contends that to the

extent Impax bases its claims on Turing's past reporting deficiencies, Turing cured any such

breaches and no further performance is outstanding.  *Id.*  According to Turing, specific

performance is moot because Impax already has obtained the very relief it seeks.  *Id.* at 39–40.

Impax, on the other hand, contends that while Turing may have improved its reporting,

there is no reason to believe that it will continue to do so in the future, given Turing's history.

---

[24] Under Section 13.12 of the APA, Impax and Turing agreed that they would "each be entitled to seek specific performance of [its] terms."  APA, § 13.12.

Pl.'s Reply at 29.  According to Impax, "for months and possibly years to come, Impax must continue relying on Turing to supply Pricing Data which Impax must report to CMS . . . remain[ing] at the whim of a party with a proven track record of delinquency and broken promises, without any indication of what Turing might do next."  *Id*.  Thus, argues Impax, summary judgment denying Impax one of the core protections to manage these risks—the right to seek specific performance of Turing's reporting obligations—is not appropriate.  *Id*.

Specific performance is an equitable remedy granted by discretion of the Court.  *See Lucente v. International Business Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002).  A court may grant specific performance where money damages would not suffice, such as when "the subject matter of the particular contract is unique and has no established market value."  *Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 415 (2001) (internal quotation marks and citation omitted).  In the instant case, it is undisputed that Turing has fully complied with its obligations to provide timely Pricing Data to Impax since June 15, 2016.  Moreover, as Turing contends, Impax does not dispute that Turing has cured any past late reporting of Pricing Data and—despite pointing to Turing's prior history of late reporting—has not adduced any evidence indicating that it is likely that Turing may fail to comply in the future.  Thus, the Court finds that granting specific performance under these circumstances—where Turing has continued to comply with its obligation to timely report Pricing Data since June 15, 2016—is unnecessary.  *See Marcus v. Lincolnshire Mgmt., Inc.*, 409 F. Supp. 2d 474, 478–79 (S.D.N.Y. 2006) ("A present willingness by [defendant] to perform might well moot the claim for specific performance.").  Moreover, as discussed, Impax is unable to prevail on any of its breach of contract claims because, by refusing to submit the proposed restatement, it has failed to perform its own obligations under the APA.  This applies with equal force to breach of contract claims

seeking specific performance. *Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Association v. DB Structured Products, Inc.*, 5 F. Supp. 3d 543, 561 (S.D.N.Y. 2014) ("[A] plaintiff also must have substantially performed its own contractual duties in order for a court to grant specific performance.") (internal quotation marks and citation omitted). Accordingly, Turing's motion for summary judgment on Impax's claim for specific performance (Count 2 of the Amended Complaint) is GRANTED.

### F. Impax's Claim that Turing's Certification of Erroneous Pricing Data is Itself a Breach of the APA (Count 4)

Turing moves for summary judgment on Count 4 of Impax's Amended Complaint, which claims that "if the Pricing Data Turing originally certified to Impax for Q3 and Q4 2015 were incorrect . . . then Turing's certification of inaccurate Pricing Data to Impax . . . is itself a breach of the [APA] . . . and was the but-for cause of Impax incurring (and continuing to incur) tens of millions of dollars of liability to state Medicaid agencies that it must pay and for which it has not been reimbursed." Am. Compl. ¶ 100. Turing contends that Impax is not entitled to recover because it failed to mitigate damages by refusing to restate the Pricing Data. Def.'s Mem. at 40. Impax, on the other hand, argues that "the duty to mitigate only calls for a party to take *reasonable* measures to minimize its damages, and does not require exposure to undue risk, burden, or expense." Pl.'s Reply at 27. According to Impax, "[b]ecause Turing's restatement is facially unreasonable, it also triggers no duty to mitigate, precluding summary judgment." *Id*. at 27–28.

Under New York law, a plaintiff in a breach of contract action has a duty to mitigate the damages that he incurs. *U.S. Bank National Association v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440 (S.D.N.Y. 2010). The plaintiff cannot recover if he failed to mitigate his damages.

*Id.* at 440–441. "This duty applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense." *Id.* at 441. As Turing points out, whether a party took reasonable measures to minimize its damages is an objective test. *See Rost v. Pfizer, Inc.*, 248 F.R.D. 417, 419–20 (S.D.N.Y. 2008) ("[B]ecause the second element of the mitigation standard asks for a determination of reasonableness, the test is an objective one. Thus, the trier of fact will be asked to examine what [plaintiff] actually did to [mitigate damages] . . . for the purpose of determining whether, under an objective standard, his actions reflected "reasonable efforts. . . . [Plaintiff's] subjective motivations . . . are irrelevant to the question of whether his conduct was objectively reasonable.") (alteration omitted); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 293, 298 (S.D.N.Y. 2009) ("Reasonableness cannot be judged solely by looking at the subjective actions of the [claimants].").

As discussed above, Impax has insisted that the relevant question with respect to its refusal to submit Turing's proposed restatement is whether its concerns about restating are subjectively reasonable. *See* Pl.'s Mem. at 19–24; Pl.'s Reply at 21. By arguing that the proposed restatement does not trigger a duty to mitigate because its concerns are subjectively reasonable, Impax attempts to "convert the mitigation test into a subjective one." *See Rost*, 248 F.R.D. at 420. Whether Impax's concerns about the proposed restatement are subjectively reasonable is irrelevant to the Court's determination of whether Impax's actions amount to a failure to mitigate. Thus, Impax has failed to establish that its failure to mitigate was objectively reasonable, particularly in view of its contractual obligation to restate. Moreover, as discussed, Impax is unable to prevail on any of its breach of contract claims because, by refusing to submit the proposed restatement, it has failed to perform its own obligations under the APA.

Accordingly, Turing's motion for summary judgment on Impax's claim for breach of contract based on incorrect Pricing Data provided by Turing (Count 4 of the Amended Complaint) is GRANTED.

## V.    Conclusion

For the reasons set forth above, Impax's motion is GRANTED in part and DENIED in part, and Turing's motion is GRANTED in part and DENIED in part. The parties are directed to appear for a status conference on October 18, 2017 at 2:30pm at the United States Courthouse, 40 Foley Square, Courtroom 619, New York, NY 10007. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 78, 82, 92, and 96.

It is SO ORDERED.

Dated:  September 28, 2017
        New York, New York

Edgardo Ramos, U.S.D.J.
United States District Judge